AO 91 (Rev. 11/11) Criminal Complaint                    AUSA Matthew L. Kutcher (312) 469-6132

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

DANIEL CAHUE;
OMAR GOMEZ; and
EMIGDIO PINTOR

**18CR          38**

CASE NUMBER:
**UNDER SEAL**

MAGISTRATE JUDGE MASON

**F I L E D**

JAN 19 2018
Jan 19 2018
MICHAEL T. MASON
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### Count One

*Code Section*

Title 18, United States Code, Sections 922(a)(1)(A) and 2

*Offense Description*

Beginning no later than August 24, 2017 and continuing to at least December 18, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant OMAR GOMEZ willfully engaged in the business of dealing in firearms not being licensed to engage in the business of dealing in firearms.

### Count Two

*Code Section*

Title 18, United States Code, Section 922(g)(1)

*Offense Description*

On or about August 24, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, defendant EMIGDIO PINTOR, a convicted felon, possessed a firearm, namely an Anderson Manufacturing Model AM-15 multi-caliber pistol bearing serial number 15255784, that had been transported in interstate commerce.



**RECEIVED**

JAN 2 2 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**Count Three**

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 922(g)(1) | On or about September 21, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, DANIEL CAHUE, a convicted felon, possessed a firearm, namely a Mag Tactical Systems LLC, Model MG-G4 multi caliber rifle bearing serial number MTS42205, that had been transported in interstate commerce. |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*Shennell Antrobus*

SHENNELL ANTROBUS
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Sworn to before me and signed in my presence.

Date: January 18, 2018

*Michael T. Mason*

*Judge's signature*

City and state: Chicago, Illinois

MICHAEL T. MASON, U.S. Magistrate Judge

*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

ss

## AFFIDAVIT

I, SHENNELL ANTROBUS, being duly sworn, state as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. I have been so employed since approximately December 2015. I am presently assigned to the ATF Chicago Field Office in Chicago, Illinois.

2.      This affidavit is submitted in support of a criminal complaint alleging that EMIGDIO PINTOR and DANIEL CAHUE have violated Title 18, United States Code, Section 922(g)(1), and OMAR GOMEZ violated Title 18, United States Code, Sections 922(a)(1)(A) and 2. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging PINTOR and CAHUE with possession of a firearm by a convicted felon, and GOMEZ with dealing in firearms without a license, and I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

3.      The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.

## FACTS SUPPORTING PROBABLE CAUSE

### *Summary*

4.     As more fully set forth below, between August 24, 2017 and December 18, 2017, DANIEL CAHUE, EMIGDIO PINTOR and OMAR GOMEZ, participated in the sale of multiple firearms to an ATF undercover agent ("UC"). CAHUE, PINTOR and GOMEZ do not have licenses to deal in firearms and CAHUE and PINTOR are convicted felons.

### *August 24, 2017 Firearm Purchase*

5.     On or about August 11, 2017, an ATF confidential source ("CS")[1] informed ATF agents that EMIGDIO PINTOR had contacted the CS about selling firearms and/or destructive devices. The CS provided the ATF with a text message he had received from (312) XXX-3989 (the "3989 Phone"), which the CS said s/he knew to be used by PINTOR. That text message contained three photographs of multiple suspected grenades.

6.     On or about August 22, 2017, the CS and PINTOR, who was using the 3989 Phone, spoke in a consensually-recorded telephone conversation.[2]

---

[1] The CS has been charged by complaint with one count of being a felon in possession of a firearm. In addition, during the investigation, CS sold cocaine to a cooperating source but CS has not yet been charged with that offense. CS is cooperating with the government in the hopes that his/her cooperation will be taken into account at sentencing. During his cooperation, CS has provided reliable information that has been corroborated by video recordings of firearms transactions. CS has prior criminal convictions for gun offenses and controlled substance offenses.

[2] The identification of PINTOR and PINTOR's voice is based on the following: (1) the CS identified PINTOR based on the CS's previous interactions with PINTOR; (2) the UC identified PINTOR based on her/his observation in two in-person meetings (as described in

According to a review of the recording, the CS arranged to purchase an AR-15 type firearm from PINTOR. PINTOR said he was brokering the deal for another person.

7. According to a review of recordings, on August 24, 2017, at approximately 2:39 p.m., in a consensually-recorded call, the CS confirmed a meeting with PINTOR in the area of West 63rd Street and South Kedzie Avenue in Chicago for later that day. On or about August 24, 2017, at approximately 6:00 p.m., ATF agents met with the CS at a predetermined location and searched the CS for the presence of contraband and firearms, none of which were found. Agents equipped the CS with an electronic audio recording device. The UC was also equipped with an electronic audio/video recording device, which included a device that allowed agents to listen to conversations in real time. Agents activated the recording and monitoring devices. The UC then accompanied the CS to the transaction in an undercover vehicle ("UCV"), which was equipped with audio/video recording devices.

8. At approximately 6:30 p.m., the UC and the CS departed the staging location in the UCV. While traveling to the meeting location, the CS received a text message from PINTOR in which PINTOR told the CS that the firearm would come with ammunition. At approximately 6:40 p.m., the UC and the CS arrived in the UCV at the meeting location and waited for PINTOR.

---

this affidavit), of the person who the CS identified as PINTOR and the UC's own comparison of that person with law enforcement database pictures of PINTOR; (3) the UC's comparison of the voice of the person s/he identified as PINTOR and the voice in the recorded calls with the CS and with the UC; and (4) my review of pictures identified as EMIGDIO PINTOR on social media.

9. According to the UC, at approximately 7:26 p.m., the UC observed a silver/gray Jeep Cherokee arrive at the meeting location near a Subway restaurant.[3] PINTOR exited the vehicle, walked over to the UCV and got into the rear passenger side seat of the UCV.

10. According to the UC and a review of recordings, PINTOR then directed the UC to drive to West 64th Place between South Homan Avenue and South Spaulding Street in Chicago. While driving, PINTOR made a cellular telephone call. According to the UC and a review of recordings, during the call, PINTOR stated, "Hey is the guy there? Well call him up see where he's at cause I'm about to pull up by your crib." Once PINTOR was off the phone, the CS told PINTOR that s/he had shown the UC the picture of the grenades that PINTOR had previously sent the CS on August 11, 2017. PINTOR said he was waiting on the person who had the grenades to contact him. The UC asked PINTOR if the grenades were real. PINTOR indicated they were real and stated "we fucking popped off like fucking um 300 of them bitches already." PINTOR indicated multiple people were buying them. The UC also commented on the picture of the AR-15 PINTOR had sent the CS and the UC told PINTOR the firearm looked fake. PINTOR indicated the person bringing the firearm had a gun license and was a "trailero." [I understand "trailero" means truck driver in Spanish.] PINTOR

---

[3] A records check on Illinois license plate Z477936, which the UC observed on the Jeep Cherokee driven by PINTOR, revealed that the plate was registered to a gold 1984 Cadillac Seville and the registered owners of the vehicle were EMIGDIO PINTOR and Individual A at W. Pershing Rd. Chicago, Illinois.

said that the supplier brings firearms from different states and has firearms all the time. PINTOR stated the person recently had an AK 47 that PINTOR sold to his brother. The UC told PINTOR that the UC would give PINTOR "a bill" [$100.00] for every firearm deal he brokered for his firearm supplier. PINTOR stated the supplier recently had two brand new 9mm pistols that were sold.

11. According to the UC and a review of recordings, upon arriving on West 64th Place, PINTOR directed the UC to park near the residence located at 3310 W. 64th Place, Chicago, Illinois (the "Subject Premises").[4] PINTOR then made a cellular telephone call. After the call, PINTOR indicated the person with the firearm was going to pull up in a truck. According to the UC, the UC then saw a Hispanic male, later identified as DANIEL CAHUE,[5] exit the Subject Premises. PINTOR identified CAHUE as his cousin. CAHUE walked up to the passenger side of the UCV and greeted PINTOR. The CS asked for a lighter and CAHUE walked back toward the residence. CAHUE soon returned to the UCV, gave the CS a lighter and walked back toward the residence.

---

[4] I believe the Subject Premises is the residence of DANIEL CAHUE because (1) in recorded conversations on November 21, 2017, CAHUE referred to the Subject Premises as his "house," his "home" and his "crib" (which is a common word for residence); (2) CAHUE was seen during multiple transactions described in this affidavit exiting and entering the Subject Premises; and (3) a law enforcement database indicates that CAHUE resides at the Subject Premises.

[5] The identification of CAHUE and CAHUE's voice is based on (1) the UC's comparison of photographs of CAHUE in law enforcement databases and photographs identified as CAHUE on social media with the person who participated in the transactions described in this Affidavit; and (2) the UC's observation of CAHUE's voice during meetings described in this Affidavit and the voice the UC heard during the recorded calls described in this Affidavit.

12.     While waiting for the firearm source to arrive, the UC engaged in casual conversation with the CS and PINTOR. PINTOR stated CAHUE was a "king" and the person coming was a "conejo." [Based on my training and experience I understand "king" to mean a Latin King gang member and "conejo" to mean a Two-Six gang member.] PINTOR stated the grenades cost $300. PINTOR indicated he had wanted a .40 caliber firearm and had asked the firearm source to bring him one. According to the UC and a review of recordings, at approximately 7:37 p.m., a white Cadillac Escalade pulled up behind the UCV.[6] CAHUE walked over to the Cadillac Escalade and opened the rear driver's door, closed the door and walked over to the passenger side. PINTOR exited the UCV, walked over to the Escalade and got into the rear driver's side passenger seat.

13.     According to the UC, while PINTOR and CAHUE were in the Escalade, the UC saw the driver of the Escalade was a Hispanic male, whom the UC later identified as OMAR GOMEZ.[7] CAHUE exited the passenger side of the vehicle and walked back to the driver's side of the Escalade and got into the rear

---

[6] After the deal, the CS informed the UC that the CS had observed the license plate of the Escalade and that it was either Z538290 or Z537290. A records check revealed Illinois license plate Z537290 was associated with a 2007 white Cadillac Escalade and the registered owners of the vehicle were OMAR GOMEZ and Individual B at an address on West 66th Street, Chicago.

[7] The identification of GOMEZ is based on the UC's review of a prior Chicago Police Department arrest photograph of OMAR GOMEZ, which matched the person the UC observed as the driver of the white Cadillac Escalade.

driver's side passenger seat. PINTOR exited the Cadillac Escalade from the passenger side and returned to the rear passenger's side seat of the UCV.

14. According to the UC and a review of recordings, at approximately 7:38 p.m., the Cadillac Escalade pulled up to the passenger side of the UCV. CAHUE exited the rear driver's side passenger seat of the Escalade and handed a backpack to PINTOR through the rear passenger side window of the UCV. PINTOR handed the backpack to the UC and assisted the UC with opening the backpack. The UC pulled a firearm out of the backpack and reviewed it. According to the UC, there was no round in the chamber of the firearm and one round in the magazine. According to a review of recordings, PINTOR handed the backpack back to CAHUE through the open rear passenger side window, and CAHUE placed the backpack into the Escalade. While the UC was looking at the firearm, the CS told GOMEZ, who was in the driver's seat of the Escalade with his window rolled down, that the UC was checking to see if the firearm was real. GOMEZ stated, "Oh it's real dog." PINTOR asked GOMEZ if he had "shells." [Based on my training and experience, I understand "shells" to mean ammunition.] GOMEZ handed a zip lock back containing ammunition to CAHUE, who handed it to PINTOR, who ultimately handed it to the UC.

15. According to the UC and a review of recordings, the UC then handed $800 to PINTOR. PINTOR handed the money to CAHUE who then handed it to GOMEZ. CAHUE walked back towards the Subject Premises. GOMEZ told PINTOR to get his number from CAHUE and then GOMEZ departed in the

Escalade. The UC observed a female sitting in the front passenger seat of the Escalade.

16. According to the UC and a review of recordings, after GOMEZ departed, the UC handed $100 to PINTOR for brokering the firearm deal. The UC drove PINTOR back to his vehicle at the Subway parking lot. While driving, PINTOR stated that GOMEZ told him the firearm the UC had just purchased was part of GOMEZ's collection. Referring to the firearm, PINTOR stated, "make sure you clean that motherfucker 'cause I touched it with my hand."

17. According to a review of recordings, before dropping PINTOR at the location where the UC and the CS picked him up earlier in the evening, the UC told PINTOR that the CS had actually been communicating with him through the UC's phone because the CS's phone was "messed up." The UC told PINTOR if he could not get through to the CS he could contact the UC directly for future firearm deals. When they arrived at the meeting location, PINTOR exited the UCV and entered into his vehicle.

18. The UC and the CS departed and then drove in the UCV to a predetermined location and met with law enforcement agents. Agents took possession of one Anderson Manufacturing Model AM-15 multi caliber pistol bearing serial number 15255784 with a 30 round magazine; one round of Federal .223 caliber ammunition; and twenty rounds of assorted .223 caliber ammunition in a zip lock bag. In addition, agents deactivated and took possession of the electronic recording and monitoring equipment from the CS and the UC.

### *September 5, 2017 Firearm Sale*

19.     According to a review of recordings, on or about September 1, 2017, at approximately 6:49 p.m. and 6:59 p.m., the CS placed two consensually-recorded calls to PINTOR. During those calls, the CS and PINTOR arranged for the purchase of an AR-15 type firearm in the area of West 63rd Street and South Kedzie Avenue in Chicago. Through further consensually-recorded calls between September 1, 2017, and September 5, 2017, the CS and PINTOR agreed to conduct the transaction in the evening of September 5, 2017.

20.     On or about September 5, 2017, at approximately 7:00 p.m., ATF agents met with the CS at a predetermined location and searched the CS for the presence of contraband and firearms, none of which were found. Agents equipped the CS with an electronic audio recording device. The UC also was equipped with an electronic audio/video recording device, which included a device that allowed agents to listen to their conversations in real time. Agents activated the recording and monitoring devices. The UC then accompanied the CS to the transaction in a UCV, which was equipped with audio/video recording devices.

21.     At approximately 7:11 p.m., the UC and the CS departed the location in the UCV and traveled toward 63rd Street and South Kedzie Avenue in Chicago. According to a review of recorded text messages, while traveling to the meet location, the CS exchanged text messages with PINTOR in which the CS asked PINTOR if the firearm came with an extended magazine and ammunition. PINTOR responded that it did and said he would find out the price for everything.

9

22. According to a review of recordings, at approximately 7:16 p.m., PINTOR called the CS to see where the CS was located. PINTOR said that the firearm supplier was already at the meet location. The CS asked about the total price with the extra magazine and ammunition but PINTOR indicated the firearm source was calling him and that he would let the CS know.

23. According to the UC and a review of recordings, at approximately 7:23 p.m., the UC and the CS arrived in the area of West 63rd Street and South Kedzie Avenue. According to a review of recordings, PINTOR called the CS to see where the CS was located. PINTOR stated he was on Spaulding Avenue in a white Chevrolet Trailblazer. PINTOR indicated the UC and the CS could follow PINTOR over to the meet location and directed the CS to his location.

24. According to the UC and a review of recordings, the UC drove out and made a southbound turn onto South Kedzie Avenue and then a westbound turn onto West 65th Street. At the intersection of West 65th Street and South Spaulding Avenue, the UC observed PINTOR, driving a white Chevrolet Trailblazer, traveling south on South Spaulding Avenue. The UC followed PINTOR to the front of the Subject Premises.

25. According to the UC, upon arriving at the Subject Premises, the UC observed the Cadillac Escalade which the UC had previously observed GOMEZ driving on August 24, 2017, parked in front of the Subject Premises. PINTOR parked his vehicle in front of GOMEZ's vehicle. The UC drove passed GOMEZ's vehicle and parked the UCV across the street from PINTOR's vehicle.

10

26.     According to the UC and a review of recordings, at approximately 7:27 p.m., PINTOR exited the Cadillac Escalade and walked over to the UCV. PINTOR got into the rear driver's side seat of the UCV. PINTOR said the supplier had two boxes of ammunition (20 rounds each) that were in a plastic bag, "like he did the other ones," as well as an extra magazine. PINTOR stated the total price was $900. The UC told PINTOR that s/he would give the supplier $20-$30 for the extra magazine, but not $50. PINTOR stated he would go talk to the supplier. PINTOR exited the UCV, walked over to the Cadillac and entered into the Cadillac.

27.     According to a review of recordings, at approximately 7:29 p.m., PINTOR returned to the rear driver's side seat of the UCV. PINTOR stated that the firearm source agreed to $850 for everything. The UC agreed to the price.

28.     According to a review of recordings, at approximately 7:30 p.m., the Cadillac Escalade pulled up to the driver's side of the UCV. According to the UC, the driver of the Cadillac Escalade was OMAR GOMEZ. GOMEZ appeared to be the only occupant of the vehicle. According to the UC and a review of recordings, PINTOR asked GOMEZ if he had change. GOMEZ stated he had $20. The UC agreed to accept $20 in change. PINTOR exited the UCV and walked to the front passenger door of the Cadillac Escalade. According to the UC, GOMEZ handed PINTOR $20 and PINTOR handed the $20 to the UC. According to the UC and a review of recordings, GOMEZ handed PINTOR the firearm and PINTOR placed the firearm on the rear floorboard of the UCV. GOMEZ handed PINTOR a black

11

bag and PINTOR placed the black bag on the back seat of the UCV. The UC then handed PINTOR $900. According to the UC, PINTOR handed the $900 to GOMEZ.

29.    According to the UC and a review of recordings, GOMEZ then said to the UC, "hey, do me favor, wipe it down bro … wipe it down, clean all the fingerprints off of it." PINTOR returned to the rear driver's side passenger seat of the UCV. The UC asked GOMEZ if he could come up with more than one firearm at a time and that the UC had "shit lined up." GOMEZ replied by saying, "If you got cash, I got everything bro, I carry everything." GOMEZ showed the UC what appeared to be at AR-15 type pistol that he had at the center console of his vehicle. The UC said s/he had the money and would talk to PINTOR. GOMEZ indicated PINTOR would contact him and that "Daniel" (referring to DANIEL CAHUE) would get a hold of him too. PINTOR asked GOMEZ for handguns. The UC told GOMEZ that s/he liked the firearm GOMEZ had just shown the UC. GOMEZ stated the firearm he had with him was expensive. The UC asked how much it cost and GOMEZ replied $1600. The UC asked if GOMEZ could get him/her something similar and GOMEZ stated he could try. GOMEZ stated he would let "them" (referring to PINTOR and CAHUE) know what he had. GOMEZ then drove off.

30.    After GOMEZ departed, the UC reviewed the firearm in the UCV and noted it contained a magazine; however, it was not loaded. PINTOR opened the black bag and showed the UC the extra magazine and ammunition. The UC handed $100 to PINTOR for brokering the firearm deal.

31.     PINTOR then said that GOMEZ had just returned from Wisconsin. The UC asked PINTOR if GOMEZ got the firearm from Wisconsin. PINTOR said GOMEZ grabs firearms from "all over the states" because GOMEZ was a truck driver. The UC told PINTOR that s/he was looking to ship firearms to New York and would like to purchase a few firearms at a time as opposed to one at a time. PINTOR said GOMEZ always has a firearm on him. PINTOR stated he was with GOMEZ the other day outside of "Groucho's" and GOMEZ fired the firearm he just had with him in the air, right in the middle of Pulaski.[8] PINTOR reminded the UC to wipe down the firearm that s/he had just purchased, which the UC understood to mean that s/he would wipe the firearm in an effort to remove fingerprints. PINTOR then exited the UCV.

32.     The UC and the CS then departed the area in the UCV and returned to the prearranged location to meet with law enforcement agents. Agents took possession of one Anderson Manufacturing Model AM-15 multi caliber pistol bearing serial number 16053042, with one Magpul 30 round magazine; and forty-six rounds of .223 caliber ammunition in a zip lock bag. In addition, agents deactivated and took possession of the electronic recording and monitoring equipment from the CS and the UC.[9]

---

[8] Based on public sources, there is a Groucho's Bar & Grill located at 8355 South Pulaski Road in Chicago.

[9] In recorded calls and text messages, PINTOR agreed to sell the UC another firearm on September 8, 2017. In a transaction that was audio and video recorded, on September 8, 2017, a person that PINTOR called his "girl" provided a Kahr Arms Model CM9 9mm pistol bearing serial number IT0173 and ammunition to the UC in exchange for $550. Immediately following that transaction, the UC and PINTOR had a recorded telephone conversation in

### *September 21, 2017 Firearm Sale*

33.    According to a review of recordings, on or about September 20, 2017, at approximately 4:05 p.m., the UC had a consensually-recorded call with DANIEL CAHUE, who was using a telephone assigned the number 312-XXX-9743 ("Subject Phone 1"). CAHUE asked if the UC was "this guy's friend, the one who always buys the things off of us?" The UC responded that the UC was. CAHUE said, "I got some new ones right now bro." The UC said s/he was "waiting for your cousin to hit me up." CAHUE said, "He's locked up bro. … He can't be driving and they caught him the other day."[10] CAHUE explained that he asked PINTOR's girlfriend to look the UC's number up on PINTOR's phone, and she had passed him the number. CAHUE continued: "so I was wondering if you were still interested." CAHUE said his name was "Jose." CAHUE said he would send the UC pictures [of firearms] and asked the UC to let him know if the UC liked them. At approximately 4:06 p.m., CAHUE, using Subject Phone 1, sent the UC two pictures of firearms, followed by a text that said, "AR15 and 22." At approximately 4:08 p.m., the UC responded, "hell yea i want them." CAHUE responded from Subject Phone 1 that he was selling them for $850 and $550. The UC then agreed to meet CAHUE the next day at 2:30 p.m.

---

which the UC confirmed that the deal took place. During that conversation, PINTOR told the UC that he had talked to his "guy" about doing deals for multiple firearms and that the supplier agreed to try to do that.

[10] According to records from the Cook County Sheriff, EMIGDIO PINTOR was arrested on September 18, 2017, and charged with Driving on a Revoked/Suspended License and Driving Under the Influence of Alcohol.

34. According to a review of telephone toll records for Subject Phone 1 received from T-Mobile, CAHUE, utilizing Subject Phone 1, placed two calls to a phone assigned telephone number 773-710-8517 ("Subject Phone 2"), while CAHUE was communicating with the UC. Based on a review of telephone records received from AT&T, "OMAR GOMEZ" was the subscriber for Subject Phone 2. At approximately 4:08 p.m., CAHUE placed a call to Subject Phone 2, which lasted 76 seconds. At approximately 4:12 p.m., CAHUE placed another call to Subject Phone 2, which lasted 122 seconds.

35. At approximately 6:16 p.m., the UC received a text message from CAHUE, who was using Subject Phone 1, which stated, "I just got off the phone with my cousin he still locked up but he has minutes to call he said you are supposed to give me $100 every time we meet so please don't forget see you tomorrow." The UC responded, "yea no prob i got u."

36. On September 21, 2017, at approximately 2:11 p.m., the UC departed a staging location in a UCV. The UC wore audio/video recording equipment and the UCV was equipped with similar audio/video recording equipment, which allowed other agents to monitor the UC's conversations in real time. At approximately 2:23 p.m., the UC arrived at the Subject Premises. Upon arriving, the UC observed a van parked on the north side of the street in front of the residence. The UC parked the UCV in front of the van. The UC placed a call to CAHUE to let him know the UC had arrived. CAHUE stated he was coming out.

37.     According to the UC, at approximately 2:24 p.m., the UC observed CAHUE exit the Subject Premises carrying a black duffel bag. According to the UC and a review of recordings, CAHUE entered the rear passenger's side seat of the UCV. CAHUE removed an AR-15 type rifle and a .22 caliber rifle from the black duffel bag and handed the firearms to the UC. Each firearm had a magazine loaded into them. Neither firearm had a round of ammunition chambered nor were either of the magazines loaded with ammunition. CAHUE provided the UC with an additional magazine for the .22 caliber rifle.

38.     According to the UC and a review of recordings, CAHUE and the UC then briefly discussed PINTOR being in custody for a traffic offense. The UC handed CAHUE $1600. CAHUE said the broker's fee was still going to PINTOR. CAHUE stated he had ammunition for the AR-15 type rifle and he would have ammunition for the .22 caliber rifle the following day. CAHUE said he would return with the ammunition for the AR-15 type rifle. According to the UC, CAHUE exited the UCV and returned to the Subject Premises.

39.     According to the UC, a few minutes later, CAHUE exited the Subject Premises and came to the driver's door of the UCV. CAHUE handed the UC two boxes of ammunition through the driver's window of the UCV. CAHUE returned to the Subject Premises and the UC departed the area.

40.     The UC then met with other law enforcement agents and removed the audio/video recording equipment. The UC provided ATF agents with the firearms and ammunition supplied to her/him by CAHUE: one Mag Tactical Systems LLC, Model

16

MG-G4 multi caliber rifle bearing serial number MTS42205; one Walther Model HK MP5 .22 caliber rifle bearing serial number HR012442; thirty-five rounds of .223 caliber ammunition; one Magpul 30 round .223 caliber magazine and two .22 caliber MP5 magazines.

### *November 3, 2017 Firearm Sale*

41.     According to a review of text messages, on or about November 1, 2017, at approximately 6:57 p.m., CAHUE, using Subject Phone 1, sent the UC two photographs of two 9mm caliber pistols, along with a text message that said "To [two] 9mm 18 shots." According to a review of recordings, at approximately 7:02 p.m., the UC had a consensually-recorded telephone conversation with DANIEL CAHUE, who was using Subject Phone 1. During this conversation, CAHUE and the UC discussed the two 9mm caliber firearms in the photographs. CAHUE offered to sell the UC the two firearms, one for $850 and one for "a stack." [Based on my training and experience, a "stack" is $1000.] CAHUE and the UC then discussed that pricing and CAHUE agreed to check with his supplier on the price for the more expensive firearm.

42.     According to a review of telephone records received from T-Mobile, at approximately 7:09 p.m., CAHUE, utilizing Subject Phone 1, placed a call to Subject Phone 2, which is subscribed to OMAR GOMEZ. That call lasted 95 seconds. At approximately 7:18 p.m., CAHUE received another call from Subject Phone 2, which lasted 50 seconds.

43.     According to a review of text messages, at approximately 7:22 p.m., CAHUE, using Subject Phone 1, sent the UC a text message that said, "He said he

could do $950 [for one of the firearms] let me know if that's cool with you if not he said he will pick it up he kinda got upset because you will be here tomorrow but let me know if I can let him out."

44.     According to a review of recordings, at approximately 7:29 p.m., the UC had a consensually-recorded telephone conversation with CAHUE, who was using Subject Phone 1. During the conversation, CAHUE confirmed that the price for the second firearm would be $950. CAHUE said he had just spoken to his supplier. The UC agreed to purchase both firearms, and CAHUE and the UC agreed to meet on November 3, 2017.

45.     According to a review of telephone records received from T-Mobile, on or about November 2, 2017, at approximately 10:05 a.m., CAHUE, utilizing Subject Phone 1, received a call from Subject Phone 2, subscribed to GOMEZ, which lasted 88 seconds.

46.     According to a review of recordings, on or about November 2, 2017 at approximately 10:11 a.m., the UC had a consensually-recorded telephone conversation with CAHUE, who was using Subject Phone 1. During that call, CAHUE explained that he was sending the UC a picture of another firearm for the UC to consider and that he would give the UC a price for the firearm if the UC liked it. CAHUE also said that he was lowering the price of the second firearm he was selling the UC later that day to $850 because "you always come and you always ready when you like something and I feel bad because its bogus." The UC agreed to pay $850 each for the two 9mm firearms. At approximately 10:12 p.m., CAHUE, using Subject

Phone 1, sent the UC two photographs of an AK 47 type pistol, along with a text message that said "$950." At approximately 10:17 a.m., the UC had a consensually-recorded telephone conversation with CAHUE, who was using Subject Phone 1 During the call, CAHUE and the UC discussed the AK 47 type pistol. The UC told CAHUE that s/he would take it. CAHUE stated that his supplier was not going to get the AK 47 type pistol until the following day at the earliest. CAHUE and the UC then discussed meeting the following day for the two pistols they discussed earlier.

47.    According to a review of telephone records received from T-Mobile, at approximately 10:19 a.m., CAHUE, utilizing Subject Phone 1, placed a call to Subject Phone 2, subscribed to GOMEZ, which lasted 95 seconds. At approximately 10:24 a.m., CAHUE, utilizing Subject Phone 1, placed another call to Subject Phone 2, which lasted 26 seconds.

48.    On November 3, 2017, at approximately 3:38 p.m., the UC departed a staging location in a UCV. The UC wore audio/video recording equipment and the UCV was equipped with similar audio/video recording equipment, which allowed other agents to monitor the UC's conversations in real time. At approximately 3:52 p.m., the UC arrived in the UCV at the Subject Premises. The UC parked on the north side of the street in front of the Subject Premises.

49.    According to the UC, at approximately 3:53 p.m., the UC observed CAHUE exit the Subject Premises carrying a black plastic garbage bag. According to the UC and a review of recordings, CAHUE entered the rear passenger's side seat of the UCV. CAHUE removed two black pistol boxes from the garbage bag and handed

19

each of them to the UC. CAHUE warned the UC that the second pistol was loaded. The UC opened the first pistol case and saw a Sig Sauer 9mm caliber pistol. The pistol was unloaded and did not contain a magazine; however, there were two loaded magazines in the box. The UC opened the second case and saw a holstered Canik 9mm caliber pistol. The pistol contained a magazine that was loaded with ammunition but there was no round in the chamber. There was also an additional loaded magazine in the box.

50.    According to a review of recordings, during the transaction, CAHUE brought up what he and the UC had previously discussed on the phone concerning the price of one of the firearms. CAHUE stated he was charging the UC $850 for each pistol and that he would deal with his firearm source, noting that the source wanted to charge $1000 for the Canik pistol. The UC told CAHUE that s/he was not trying to cause any issues. CAHUE said that he understood and it was not an issue. CAHUE said that he agreed with the UC and that CAHUE was bothered about the price his source was asking for one of the pistols. The UC reminded CAHUE that s/he was going to take care of CAHUE anyway with a broker's fee. The UC asked CAHUE about his cousin (referring to PINTOR). CAHUE stated PINTOR was trying to get $9000 to get out of jail. The UC handed CAHUE $1900. After he received the money, CAHUE mentioned another firearm that he was willing to sell and he and the UC agreed to discuss that firearm and possibly conduct the transaction on November 6, 2017.

51. According to the UC, CAHUE then exited the UCV with the garbage bag and returned to the Subject Premises. The UC departed the area in the UCV. At a prearranged location, the UC met with other law enforcement agents and removed the audio/video recording equipment. The UC provided ATF agents with the firearms and ammunition supplied to her/him by CAHUE: one Canik (Imported by Century Arms) Model TP-9SA 9mm caliber pistol bearing serial number 16AP20255 with magazine; twelve rounds Remington 9mm caliber ammunition; one Canik firearm box/case containing holster, extra magazine and other firearm accessories; eleven rounds Remington 9mm caliber ammunition; one Sig Sauer Model P250 9mm caliber pistol bearing serial number EAK212402 with magazine; twelve rounds assorted 9mm caliber ammunition; one Sig Sauer firearm box/case containing holster, extra magazine and other firearm accessories; thirteen rounds of assorted 9mm caliber ammunition.

### *November 7, 2017 Firearm Sale*

52. According to a review of text messages, on or about November 6, 2017, at approximately 3:40 p.m., CAHUE sent a text message from Subject Phone 1 to the UC, which stated "Just a question I'm a man of my word and I think and I know you are last time you came and this time and sort of $100 for my cousin so what this one in the last one is 200 what's up with that I'm just asking because if not he's going to be wondering if he gets out I don't want no problems."

53. According to a review of recordings, at approximately 3:48 p.m., the UC placed a consensually-recorded call to Daniel CAHUE, who was using Subject Phone

1. During the call, CAHUE explained that he was $100 short on the money he received. CAHUE said, "I am a straight person … we always on the same page … I've got no reason to lie to you." The UC explained that the UC counted out $1800 and handed that to CAHUE. CAHUE said he had $1700. CAHUE said, "You know what bro, I'm not gonna even trip. We'll leave it like that. It's cool."

54.     At approximately 6:38 p.m., the UC placed a consensually-recorded call to Daniel CAHUE, who was using Subject Phone 1. CAHUE said, "Hey man, the money was stuck together bro." CAHUE went on to say, "My guy said he's gonna send me pictures in a little while too. … I told him not to set me up to sell me anything expensive. … I don't want him to jack up the prices so much, and you say, you know what, fuck it dude, thanks a lot for doing business and then you go somewhere else. … I don't want you to feel bad, you know, they're trying to rip you off … and I don't want you to feel that way, so if you feel that it's too expensive bro, you tell me, and we'll wait until my other guy gets back, and that's it. And I'll this guy, you know what bro, I'm good." CAHUE agreed that he would send the UC a picture of the next firearm as soon he receives it.

55.     According to a review of telephone records received from T-Mobile, on or about November 7, 2017, at approximately 7:23 a.m., CAHUE, utilizing Subject Phone 1, placed a call to Subject Phone 2, subscribed to GOMEZ, which lasted 149 seconds. At approximately 8:00 a.m., CAHUE, utilizing Subject Phone 1, placed another call to Subject Phone 2, which lasted 10 seconds.

56. According to a review of text messages, at approximately 8:02 a.m., CAHUE sent the UC a text message containing a photograph of an AR-15 type firearm from Subject Phone 1. At approximately 8:46 a.m., the UC responded, "nice… ill take it." At approximately 8:47 a.m., the UC sent another text message to CAHUE at Subject Phone 1 that said, "can I pick it up tomorrow?" At approximately 8:54 a.m., CAHUE responded with a text message from Subject Phone 1 that said, "Between 3 and 4 tomorrow."

57. According to a review of telephone records received from T-Mobile, at approximately 8:54 a.m., CAHUE, utilizing Subject Phone 1, placed a call to Subject Phone 2, subscribed to GOMEZ, which lasted 246 seconds. At approximately 9:23 a.m, CAHUE, utilizing Subject Phone 1, placed another call to Subject Phone 2, which lasted 16 seconds.

58. At approximately 9:24 a.m., CAHUE sent the UC a text message containing a photograph of a .45 caliber pistol from Subject Phone 1. At approximately 10:07 a.m., the UC responded, "that shit is bad ass! … ill take that too."

59. According to a review of recordings, during three consensually-recorded calls between 4:38 p.m. and 5:12 p.m., CAHUE, who was using Subject Phone 1, and the UC agreed to conduct another firearm transaction later that evening. At approximately 6:56 p.m., the UC departed a staging location in a UCV. The UC wore audio/video recording equipment and the UCV was equipped with similar audio/video

recording equipment, which allowed other agents to monitor the UC's conversations in real time.

60.     According to the UC, at approximately 7:08 p.m., the UC arrived at the Subject Premises. The UC parked across the street from the residence, on the south side of the street. At approximately 7:09 p.m., the UC observed CAHUE walking towards the UCV carrying a black pistol case. CAHUE entered the rear passenger's side seat of the UCV. CAHUE unzipped his sweatshirt/jacket and removed an AR-15 type firearm from inside his sweatshirt/jacket. CAHUE handed the AR-15 type firearm to the UC and said it was not loaded. The UC removed an empty 30 round magazine from the firearm. CAHUE handed the UC an additional 30 round magazine and ammunition for the AR-15 type firearm. CAHUE then handed the UC the pistol case, which contained a .45 caliber pistol. CAHUE told the UC that the firearm was loaded. The UC removed the magazine from the firearm and noted that it was loaded with ammunition; however, there was no round in the chamber. The UC handed CAHUE $2550.

61.     During the transaction, CAHUE said he had talked to his "other guy" and indicated he still would not be back for another week (referring to his first source). CAHUE said that if the UC was still interested in the firearm CAHUE texted the UC a picture of on October 27, 2017 (an AR-15 type rifle), it could be dropped off at CAHUE's residence. While CAHUE was talking, a marked Chicago Police Department vehicle passed in front of the UCV. CAHUE pointed out the vehicle to

the UC and became nervous. CAHUE advised the UC that the UC should leave and said they would need to find a new spot to meet. CAHUE told the UC to be careful.

62.     CAHUE then exited the UCV and returned to his residence. The UC departed the area in the UCV. At a prearranged location, the UC met with other law enforcement agents and removed the audio/video recording equipment. The UC provided ATF agents with the firearms and ammunition supplied to her/him by CAHUE: one Anderson Manufacturing Model AM-15 multi caliber firearm bearing serial number 16409515; two Magpul Industries PMAG 30 round capacity magazines; 60 rounds PMC .223 caliber ammunition; one Glock Model 21 .45 caliber pistol bearing serial number YLW025 with magazine; 10 rounds of assorted .45 caliber ammunition; and one black firearm soft case including screwdrivers.

### *December 8, 2017 Firearm Sale*

63.     According to a review of telephone records received from T-Mobile, on or about December 6, 2017 between 12:07 p.m. and 12:08 p.m., CAHUE, utilizing Subject Phone 1, exchanged text messages with Subject Phone 2, subscribed to GOMEZ. According to a review of text messages, on or about December 6, 2017, at approximately 12:11 p.m., CAHUE, utilizing Subject Phone 1, sent the UC a photograph of a  pistol along with a text message that said, "9mm $950."

64.     According to a review of recordings, on or about December 6, 2017 at approximately 12:59 PM, the UC had a consensually-recorded phone call with CAHUE, who was utilizing Subject Phone 1. During the call, the UC agreed to

purchase the 9mm pistol. CAHUE stated he would see if he could get additional firearms for the UC.

65.　According to a review of telephone records received from T-Mobile, on or about December 7, 2017, at approximately 12:11 p.m., CAHUE, utilizing Subject Phone 1, received a call from Subject Phone 2, subscribed to GOMEZ, which lasted approximately 63 seconds.

66.　According to a review of recordings, on or about December 7, 2017 at approximately 12:26 p.m., the UC had a consensually-recorded phone call with CAHUE, who was using Subject Phone 1. CAHUE stated he was going to get another firearm for the UC later in the day. The UC and CAHUE agreed to meet at the Subject Premises on December 8, 2017.

67.　On December 8, 2017, at approximately 1:41 p.m., the UC departed a staging location in a UCV. The UC wore audio/video recording equipment and the UCV was equipped with similar audio/video recording equipment, which allowed other agents to monitor the UC's conversations in real time. According to the UC, at approximately 1:54 p.m., the UC arrived at the Subject Premises. The UC parked on the north side of the street just west of the residence. Upon arriving, the UC observed CAHUE exit the driver's seat of a red pickup truck parked on the south side of street, across the street from the residence.

68.　The UC observed CAHUE carrying two firearm cases/boxes. CAHUE entered the rear passenger's side seat of the UCV. CAHUE handed the UC a black Glock pistol case/box. CAHUE warned the UC that both firearms were loaded.

CAHUE also handed the UC a box of .22 caliber ammunition and stated "these were the rounds that I was...didn't give you that day," referring to the previously deal where CAHUE sold the UC a .22 caliber pistol. The UC noted the Glock case/box contained a Glock .40 caliber pistol. The pistol contained a magazine that was loaded with ammunition but there was no round in the chamber. After the UC reviewed the first pistol, CAHUE handed the UC a black Taurus pistol box. The UC noted the box contained a Taurus 9mm pistol. The pistol contained a magazine that was loaded with ammunition but there was no round in the chamber.

69.     According to the UC and a review of recordings, during the transaction, the UC asked CAHUE about those "long ones" referring to three rifles in a photograph that CAHUE had texted the UC from Subject Phone 1 and offered to sell on November 21, 2017. CAHUE indicated his source did not get them. CAHUE stated next time he would wait and once his source had everything CAHUE would let the UC know. CAHUE stated while the UC was away CAHUE would send the UC photographs of firearms. CAHUE stated if the UC responded CAHUE would get them for the UC, if not CAHUE's source would get rid of them. CAHUE stated he was referring to his second source. The UC handed CAHUE $2100.

70.     After the transaction, CAHUE exited the UCV and returned to the driver's seat of the red pickup truck. The UC departed the area in the UCV. At a prearranged location, the UC met with other law enforcement agents and removed the audio/video recording equipment. The UC provided ATF agents with the firearms and ammunition supplied to her/him by CAHUE: one hundred (100) rounds of

27

Winchester .22 caliber ammunition; Glock, Model 27GEN4, .40 caliber pistol bearing serial number UYN192; Glock case/box bearing serial number TYW961 and containing four (4) .40 caliber magazines; thirteen (13) rounds of assorted .40 caliber ammunition; Taurus, Model PT111 Millennium G2, 9mm caliber pistol bearing serial number TKT79259; twenty (20) rounds of Federal 9mm caliber ammunition; Taurus pistol box containing two magazines and firearm paperwork.

### *December 18, 2017 Firearm Sale*

71.     According to a review of telephone records received from T-Mobile, on or about December 12, 2017 between 10:55 a.m. and 11:56 a.m., CAHUE, utilizing Subject Phone 1, exchanged calls and text messages with Subject Phone 2, subscribed to GOMEZ. According to a review of text messages, on or about December 12, 2017, at approximately 11:58 a.m., CAHUE, utilizing Subject Phone 1, sent the UC photographs of three firearms along with text messages that said, "$950 9mm, 357 $900, Ak $1450. "

72.     According to a review of recordings, on or about December 12, 2017 at approximately 12:12 PM, the UC had a consensually-recorded phone call with CAHUE, who was utilizing Subject Phone 1. The UC agreed to purchase the three firearms on December 18, 2017; however, the UC asked CAHUE to see if his supplier would lower the prices on the 9mm pistol and the .357 revolver. CAHUE stated he would contact his supplier.

73.     According to a review of telephone records received from T-Mobile, on or about December 12, 2017 at approximately 12:13 p.m., CAHUE, utilizing Subject

Phone 1, placed a call to Subject Phone 2, subscribed to GOMEZ, which lasted 1 minute and 16 seconds.

74. According to a review of text messages, on or about December 12, 2017, at approximately 12:16 p.m., CAHUE, utilizing Subject Phone 1, sent the UC text message that said, "Okay he responded I thought he was going to take longer but on the 9mm he will give it to you for 850 the other ones that's the lowest so let me know."

75. According to a review of recordings, between December 12, 2017 and December 17, 2017, the UC had multiple consensually-recorded phone calls with CAHUE, who was using Subject Phone 1. During these conversations, CAHUE ultimately offered to sell the UC five pistols and a revolver. The UC and CAHUE agreed to meet at the Subject Premises on December 18, 2017.

76. On December 18, 2017, at approximately 1:46 p.m., the UC departed a staging location in a UCV. The UC wore audio/video recording equipment and the UCV was equipped with similar audio/video recording equipment, which allowed other agents to monitor the UC's conversations in real time. According to the UC, at approximately 2:01 p.m., the UC arrived at the Subject Premises.

77. Initially, the UC parked on the north side of the street just west of the Subject Premises; however, the UC then repositioned the UCV and parked directly in front of the Subject Premises (still on the north side of the street). The UC parked behind a red Dodge pickup truck bearing Illinois license plate 2209685, which, according to the UC, was the same vehicle CAHUE exited and returned to before and after the deal that occurred on December 8, 2017. According to a review of text

messages, as the UC was arriving, CAHUE sent a text message to the UC from Subject Phone 1 that stated, "Pull up in front of the old lady let her go in and then I'll come out." Once the UC parked the UCV, the UC sent a text message to CAHUE that stated, "outside."

78.     According to the UC, at approximately 2:02 p.m., CAHUE exited the Subject Premises carrying a black firearm box and white plastic bag. According to the UC and a review of recordings, CAHUE opened the rear driver's side passenger door and placed the box and plastic bag in the UCV. CAHUE closed the door, walked behind the UCV and entered the rear passenger's side seat of the UCV. Upon entering the UCV, CAHUE suggested to the UC that the UC adjust how the UCV was parked since it was sticking out onto the street. The UC adjusted the UCV and parked closer to the curb. The UC asked CAHUE if the red truck parked in front of the UCV was CAHUE's truck and CAHUE replied affirmatively.

79.     According to a review of recordings, while in the UCV, CAHUE handed the UC the black firearm box. According to the UC, the box was a Century Arms firearm box containing an AK 47 type pistol. The firearm was not loaded but there was ammunition in the box. According to the UC and a review of recordings, CAHUE then removed three 9mm caliber pistols, one .380 caliber pistol, a .357 caliber revolver and ammunition from the white plastic bag and handed the items to the UC. Each of the four pistols were in a pistol box/case. Each of the four pistols contained a magazine loaded with ammunition but none of the pistols had a round in the chamber. The revolver was not loaded with ammunition.

80. According to the UC and a review of recordings, While reviewing one of the Smith & Wesson 9mm pistol, the UC pointed out that the price his source wanted for the pistol did not make any sense. The UC asked CAHUE if this was his second source and he replied affirmatively. CAHUE stated his other source (the first one) was not "fucking around yet" but CAHUE was trying to convince him. The UC asked CAHUE if the first source [GOMEZ] was the one the UC met and CAHUE replied affirmatively.

81. According to the UC and a review of recordings, the UC told CAHUE that s/he had $5850 for the firearms and $600 for him. CAHUE stated he thought they had agreed on $5950 for the firearms. CAHUE stated he had left his phone in his residence. The UC reviewed his text messages and reminded CAHUE that he had offered one of the firearms (the .380 caliber pistol) for $750. According to the UC, the UC handed CAHUE $6450.

82. According to the UC and a review of recordings, the UC told CAHUE that s/he was going to New York and would return in a month. The UC indicated he was flipping the firearms he had just purchased in New York. The UC told CAHUE that CAHUE could continue to contact him/her but that the UC would not be able to pick anything up until after New Year's. The UC asked CAHUE how long he would be able to hold firearms for him/her. Initially, CAHUE stated that was a problem because if he tried to get other things from his source to sell to other people his source would tell him he had too much already and he could not give him more. The UC asked CAHUE if he had a lot of other people he was "fucking with" (meaning was he

selling firearms to a lot of other people) and CAHUE responded, "Yea." CAHUE stated that since he knows the UC always comes no matter what, he had no problem with holding them for the UC. CAHUE stated that if anything he would wait until the UC was almost ready to come back and then he would "pile up." The UC asked CAHUE how long he could hold something for him/her and CAHUE responded probably two or three weeks.

83.    According to the UC, after the transaction, CAHUE exited the UCV with the white plastic bag and returned to the Subject Premises. The UC departed the area in the UCV.

84.    According to a review of recordings, at approximately 2:13 p.m., CAHUE called the UC from Subject Phone 1. CAHUE asked the UC which firearm he had offered for $750 and indicated he was reviewing the text messages on his phone. CAHUE stated he had offered the .380 for $850. The UC reminded CAHUE that s/he had asked CAHUE to resend messages he had previously sent and CAHUE offered the .380 caliber firearm for $750. CAHUE indicated he had found the text message on his phone where he lowered the price and that he had made a mistake but it was not a problem.

85.    At a prearranged location, the UC met with other law enforcement agents and removed the audio/video recording equipment. The UC provided ATF agents with the firearms and ammunition supplied to her/him by CAHUE: Smith & Wesson, Model SD9VE, 9mm caliber pistol bearing serial number FZF4558; Sixteen (16) rounds of assorted 9mm caliber ammunition; black firearm case containing three

(3) 9mm magazines and firearm paperwork; Taurus, Model PT738, .380 caliber pistol bearing serial number ID066589; six (6) rounds of assorted .380 caliber ammunition; orange firearm box containing.380 caliber magazine and firearm paperwork; Taurus, Model PT111 Millennium G2, 9mm caliber pistol bearing serial number TKU33644; ten(10) rounds of assorted 9mm caliber ammunition; black Taurus firearm box (with sticker listing Jose Leiva as buyer) containing two magazines and firearm paperwork; Taurus, Model PT111 Millennium G2, 9mm caliber pistol bearing serial number TJU46217; eight (8) rounds of assorted 9mm caliber ammunition; black Taurus firearm box containing two magazines and firearm paperwork; Romarm/Cugir, Model Draco, 7.62 caliber pistol bearing serial number DB-2721-17RO; twenty (20) rounds of Winchester 7.62 caliber ammunition; Century Arms firearm box containing one magazine and firearm paperwork; Rossi (Manufactured by Taurus), .357 caliber revolver bearing number FY700989; Sixteen (16) rounds of Hornady .357 caliber ammunition; twenty eight (28) rounds of Winchester .380 caliber ammunition.[11]

### *Interstate Nexus*

86.     An ATF firearms interstate nexus expert physically examined all the firearms purchased by the UC and made a determination that none of the firearms were manufactured in the state of Illinois and therefore they all had traveled in interstate commerce.

---

[11] According to the UC and a review of recordings, on September 23, 2017, October 7, 2017, November 6, 2017, November 14, 2017 and November 21, 2017, CAHUE also possessed and sold firearms to the UC in a similar manner to the other controlled firearms transactions described in this Affidavit.

### *Firearms License Inquiry*

87.     A query of the Federal Licensing System has confirmed that PINTOR, CAHUE and GOMEZ are not federal firearms licensees. A query of Illinois state records indicate that GOMEZ has a Firearm Owners Identification ("FOID") card.

### *Criminal Histories*

88.     According to a review of PINTOR's criminal history, PINTOR has been convicted of a least three crimes punishable by imprisonment for a term exceeding one year, including: (a) an October 28, 2002 conviction in the Circuit Court of Cook County, Illinois, for Receive/Poss/Sell Stolen Vehicle, for which PINTOR was sentenced to 18 month's probation; (b) an August 5, 2011 conviction in the Circuit Court of Cook County, Illinois, for Aggravated DUI, for which PINTOR was sentenced to 42 months' imprisonment; (c) a March 25, 2016 conviction in the Circuit Court of Cook County, Illinois, for Driving RVK/SUSP DUI/SSS 3rd for which PINTOR was sentenced to 1 year imprisonment.

89.     According to a review of CAHUE's criminal history, CAHUE has been convicted of at least two crimes punishable by imprisonment for a term exceeding one year, including: (a) a May 30, 2006 conviction in the Circuit Court of Cook County, Illinois, for Aggravated Unlawful Use of Weapon/Vehicle, for which CAHUE was sentenced to 2 days imprisonment and 18 months probation; and (b) a May 31, 2016 conviction in the Circuit County of Cook County, Illinois, for Aggravated DUI/No Valid DL for which CAHUE was sentenced to 10 days' imprisonment and 2 years' probation.

## CONCLUSION

90. Based on the foregoing, I respectfully submit there exists probable cause to believe that (1) on or about August 24, 2017, EMIGDIO PINTOR, a convicted felon, possessed a firearm, namely one Anderson Manufacturing Model AM-15 multi-caliber pistol bearing serial number 15255784, that had been transported in interstate commerce, in violation of Title 18, United States Code, Section 922(g)(1); (2) on or about September 21, 2017, DANIEL CAHUE, a convicted felon, possessed a firearm, namely one Mag Tactical Systems LLC, Model MG-G4 multi caliber rifle bearing serial number MTS42205, that had been transported in interstate commerce, in violation of Title 18, United States Code, Section 922(g)(1); and (3) beginning on or about August 24, 2017, and continuing through at least December 18, 2017, OMAR GOMEZ, willfully engaged in the business of dealing in firearms not being a licensed importer, manufacturer, or dealer in firearms within the meaning of Chapter 44, Title 18, United States Code, in violation of Title 18, United States Code, Section 922(a)(1)(A).

FURTHER AFFIANT SAYETH NOT.

SHENNELL ANTROBUS
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SUBSCRIBED AND SWORN
to before me on January 19, 2018.

MICHAEL T. MASON
United States Magistrate Judge

35